UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TAMMY ALLEN, PERSONAL REPRESENTATIVE )
OF THE ESTATE OF NORMAN ALLEN,               )
          Plaintiff,                                              )
                                     )    **1:05-CV-011463**
V.                                                                  )
                                     )
THE UNITED STATES OF AMERICA,             )
      Defendant.                                             )
*******************************************

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

The plaintiff, Tammy Allen, Personal Representative of the Estate of Norman Allen,

submits the following proposed findings of fact and rulings of law.

**FINDINGS OF FACT**

1.      At all times relevant, Michael Kelly, M.D. was a physician licensed to practice medicine in the Commonwealth of Massachusetts.

2.      At all times relevant, Michael Kelly, M.D. was acting as an agent, servant, and/or employee of the United States of America.

3.      A doctor/patient relationship existed between Norman Allen and Michael Kelly, M.D. from 1997 until September 1999.

4.      The plaintiff has satisfied all statutory conditions precedent to bringing this action.

5.      The prognosis of a rectal cancer patient depends largely on the degree of spread at diagnosis.

6.      When detected early, rectal cancer is very treatable and amenable to cure.

7.      If detected after it has spread beyond the rectum to the lymph nodes, a rectal cancer patient is likely to die from the disease.

8.      Early detection and diagnosis is considered essential to halting the progression of rectal cancer.

9.      The progression of colorectal cancer is measured in stages.

10.    The prognosis for a patient with colorectal cancer is largely dependent upon the stage of the cancer at the time of diagnosis.

11.    When colorectal cancer is diagnosed in an earlier stage, the prognosis is better.

12.    When colorectal cancer is diagnosed in a later stage, the prognosis is worse.

13.    Individuals over the age of 50 are at greater risk of developing rectal cancer than are younger individuals.

14.    Norman Allen was born on November 24, 1947.

15.    Norman Allen turned 50 years old on November 24, 1997.

16.    Norman Allen first saw Michael Kelly, M.D. in 1997.

17.    Norman Allen's family history was positive for rectal cancer in his father.

18.    As an adult over the age of 50 with family history of rectal cancer in his father, Mr. Allen was at increased risk for developing rectal cancer.

19.    Dr. Kelly did not offer or perform any colorectal cancer screening for Norman Allen in 1997.

20.    Dr. Kelly did not offer or perform any colorectal cancer screening for Norman Allen in 1998.

21.    Dr. Kelly did not offer or perform any colorectal cancer screening for Norman Allen in 1999.

22.    At all relevant times, colorectal cancer screening consisted of a digital rectal examination, sigmoidoscopy with barium enema, fecal occult blood testing, or a colonoscopy.

23.    A digital rectal examination is a standard part of an annual physical examination for an adult male.

24.    At no time did Michael Kelley, M.D. ever perform a digital rectal examination on Norman Allen.

25.    When Norman Allen presented to Michael Kelly, M.D. on April 6, 1999, he was 51 and a half years old.

26.    Weight loss is a symptom associated with colorectal cancer.

27.    A change in bowel pattern is a symptom associated with colorectal cancer.

28.    Mr. Allen complained of pain, weight loss and of frequent bowel movements when he presented to Dr. Kelly on April 6, 1999.

29.    Dr. Kelly did not <u>offer or</u> perform a sigmoidoscopy with barium enema, fecal occult blood testing, or a colonoscopy on Norman Allen on April 6, 1999.

30.    <u>Dr. Kelly did not perform a digital rectal exam on Norman Allen on April 6, 1999</u>.

31.    Dr. Kelly did not perform any colorectal screening on Norman Allen on April 6, 1999.

32.    On July 13, 1999, Mr. Allen followed up with Robert Simms, M.D. for evaluation of his fibromyalgia.

33.    On July 13, 1999, Mr. Allen reported to Dr. Simms that he had been experiencing intermittent episodes of bloody stool.

34.    On July 13, 1999, Dr. Simms encouraged Mr. Allen to follow-up with Dr. Kelly.

35.    Following the visit on July 13, 1999, Dr. Simms sent Dr. Kelly a copy of his dictated report that contained reference to Mr. Allen's episodes of bloody stool.

36.    <u>Norman Allen followed up with Dr. Kelly</u> on August 3, 1999 but Dr. Kelly made no reference to Mr. Allen's episodes of bloody stool.

37.    <u>On August 3, 1999, Dr. Kelly deferred a physical examination of Mr. Allen</u>.

38.    Dr. Kelly noted that he was aware of Mr. Allen's visit with Dr. Simms.

39.    Dr. Kelly received and read Dr. Simms' report and was aware of the finding of bloody stools.

40.    <u>On August 3, 1999, Dr. Kelly neither offered nor performed colorectal screening in the form of a rectal exam, fecal occult blood testing, sigmoidoscopy with barium enema or colonoscopy.</u>

41.    <u>In 1998 and 1999, average qualified physicians knew or should have known of the risks of developing rectal cancer for someone in Norman Allen's situation.</u>

42.    <u>In 1998 and 1999, Dr. Kelly knew or should have known the risks, potential consequences, and alternatives to Dr. Kelly's course of treatment which was to not perform a rectal exam, fecal occult blood testing, a barium enema with sigmoidoscopy, or a colonoscopy.</u>

43.    During the years that Dr. Kelly treated Mr. Allen, Dr. Kelly did not conduct colorectal cancer screening for Mr. Allen because Mr. Allen's other symptoms distracted Dr. Kelly from conducting colorectal cancer screening.

44.    In 1998 and 1999, the risk for Norman Allen of not undergoing colorectal cancer screening was that he would develop colorectal cancer and that it would go undiagnosed and untreated.

45.    In 1998 and 1999, the risk of Norman Allen not undergoing colorectal cancer screening was material.

46.    In 1998 and 1999, the risk of Norman Allen not undergoing colorectal cancer screening was not negligible.

47.    In 1998 and 1999, the risk of Norman Allen not undergoing colorectal cancer screening was not practically nonexistent.

48.    In 1998 and 1999, the risk of Norman Allen not undergoing colorectal cancer screening was significant.

49.    In 1998 and 1999, the risk of Norman Allen not undergoing colorectal cancer screening was not remote.

50.    The alternatives to and the risks and potential consequences of Dr. Kelly's course of treatment were material to a decision by Norman Allen as to whether to undergo Dr. Kelly's course of treatment.

51.    The alternatives to and the risks and potential consequences of Dr. Kelly's course of treatment were material to a decision by a reasonable person in Normal Allen's situation as to whether to undergo Dr. Kelly's course of treatment.

52.    Had Dr. Kelly offered colorectal cancer screening, Mr. Allen would have agreed to undergo the testing.

53.    Had Dr. Kelly offered colorectal cancer screening, a reasonable person in Mr. Allen's position would have agreed to undergo the testing.

54.    Had Dr. Kelly offered a digital rectal examination as part of a physical examination, Mr. Allen would have agreed to undergo the digital rectal examination.

55.    Had Dr. Kelly offered a digital rectal examination as part of a physical examination, a reasonable person in Mr. Allen's position would have agreed to undergo the digital rectal examination.

56.    <u>The course of treatment chosen by Dr. Kelly was not to perform a digital rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy.</u>

57.    In 1998 and 1999, digital rectal examination, fecal occult blood testing, barium enema with sigmoidoscopy, and colonoscopy were available courses of treatment.

58.    <u>At no point during his treatment of Mr. Allen did Dr. Kelly offer Mr. Allen a rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy.</u>

59.    <u>Had Dr. Kelly ordered a rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy for Norman Allen, Mr. Allen would have undergone the testing.</u>

60.    <u>Had Dr. Kelly offered a digital rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy to Norman Allen, a reasonable person in Mr. Allen's situation would have undergone the testing.</u>

61.    <u>Had Dr. Kelly ordered a rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy for Norman Allen, Mr. Allen's rectal cancer would have been detected at an earlier stage.</u>

62.    <u>Had Dr. Kelly detected Mr. Allen's rectal cancer at an earlier stage, Mr. Allen would have received treatment before the cancer spread to his lymph nodes.</u>

63.    In September of 1999, Mr. Allen switched his healthcare provider to David Farzan, M.D.

64.    On September 27, 1999, Mr. Allen presented to Dr. Farzan for a physical exam.

65.    On September 27, 1999, Dr. Farzan noted Mr. Allen's history of hematochezia (bloody stool) and his family history of rectal cancer.

66.    On September 27, 1999, Dr. Farzan performed a digital rectal exam on Norman Allen.

67.    Dr. Farzan referred Mr. Allen to Thomas Fazio, M.D., a gastroenterologist, for an evaluation.

68.    On October 4, 1999, Mr. Allen presented to Dr. Fazio.

69.    D. Fazio took an appropriate history and was able to elicit Norman Allen's complaints of rectal bleeding, frequent bowel movements, a feeling of incomplete bowel movements, alternating diarrhea and constipation, and lower abdominal cramps.

5

70.   Dr. Fazio noted Mr. Allen's family history of rectal cancer and ordered a colonoscopy.

71.   Norman Allen underwent a colonoscopy on October 20, 1999.

72.   Mr. Allen's colonoscopy showed a mass that was 3cm in size and located 6cm into the rectum.

73.   The mass was biopsied and pathology <u>differentiated showed moderately</u> adenocarcinoma of the rectum.

74.   A transrectal ultrasound was performed on Norman Allen on November 3, 1999.

75.   The transrectal ultrasound showed evidence of invasion and involvement of the muscularis propria.

76.   Mr. Allen underwent a surgical low anterior resection for his rectal cancer on December 1, 1999.

77.   Pathology from the surgical specimen showed lymphatic invasion with one of six lymph nodes positive for metastatic adenocarcinoma that extended beyond the lymph node capsule.

78.   Mr. Allen was diagnosed with Stage III rectal cancer following his December, 1999 surgery.

79.   Postoperatively, Mr. Allen received chemotherapy and radiation.

80.   In April 2002, extensive liver metastasis was found.

81.   On May 18, 2002, Mr. Allen died from metastatic rectal cancer at the age of 54.

82.   <u>At the time of his death, Norman Allen had a life expectancy of 24.9 more years</u>.

83.   <u>Norman Allen had a work-life expectancy of 11 more years</u>.

84.   <u>I find the testimony of the plaintiff's expert witness, Alfred I. Neugut, M.D. to be credible in this case</u>.

85.   <u>I find in accordance with the testimony of the plaintiff's expert witness, Alfred I. Neugut, M.D. that the standard of care in 1998 and 1999 required the average qualified physician to offer or perform annual colorectal cancer screening to adult male patients starting at age 50</u>.

86. I find in accordance with the testimony of the plaintiff's expert witness, Alfred I. Neugut, M.D. that the standard of care in 1998 and 1999 required the average qualified physician to offer or perform digital rectal examinations on an annual basis as part of a physical examination.

87. I find in accordance with the testimony of the plaintiff's expert witness, Alfred I. Neugut, M.D. that the standard of care in 1998 and 1999 required Michael Kelly, M.D. to offer or perform annual colorectal cancer screening to Norman Allen.

88. I find in accordance with the testimony of the plaintiff's expert witness, Alfred I. Neugut, M.D. that the standard of care in 1998 and 1999 required Michael Kelly, M.D. to offer or perform digital rectal examinations to Norman Allen as part of an annual physical examination.

89. Dr. Kelly had a duty to disclose to Norman Allen information concerning the risks and benefits of colorectal screening in the form of a rectal exam, fecal occult blood testing, sigmoidoscopy with barium enema or colonoscopy.

90. Dr. Kelly failed to disclose to Norman Allen the risks and benefits of colorectal screening in the form of a rectal exam, fecal occult blood testing, sigmoidoscopy with barium enema or colonoscopy

91. I find in accordance with Dr. Neugut's testimony that the defendant, The United States of America, by and through Dr. Kelly, deviated from the accepted standards of medical care when Dr. Kelly failed to offer or perform any colorectal cancer screening for Norman Allen.

92. I find in accordance with Dr. Neugut's testimony that the defendant, The United States of America, by and through Dr. Kelly, deviated from the accepted standards of medical care when Dr. Kelly failed to offer or perform a digital rectal examination for Norman Allen.

93. I find in accordance with Dr. Neugut's testimony that Norman Allen suffered a wrongful death as a direct and proximate result of Dr. Kelly's deviations from the accepted standards of care.

94. I find in accordance with Dr. Neugut's testimony that Norman Allen sustained conscious pain and suffering as a direct and proximate result of Dr. Kelly's deviations from the accepted standards of care.

95. I find in accordance with Dr. Neugut's testimony that Dr. Kelly's breach of his duty to provide informed consent to Norman Allen caused or contributed to his death.

96. I find in accordance with Dr. Neugut's testimony that had Dr. Kelly treated Norman Allen in accordance with the appropriate standard of care, it is more

7

likely than not that Norman Allen would not have died prematurely on May 18, 2002.

97.     Based on all of the credible evidence presented at trial, the Court finds that the defendant, The United States of America, by and through Dr. Kelly, deviated from the accepted standards of medical care in 1998 and 1999 in failing to perform a digital rectal exam, fecal occult blood testing, barium enema with sigmoidoscopy, or colonoscopy on Norman Allen.

98.     The Court finds that as a direct and proximate result of the defendant's deviations from the accepted standards of medical care, the plaintiff's decedent, Norman Allen, suffered a wrongful death.

99.     The Court finds that as a direct and proximate result of the defendant's deviations from the accepted standards of medical care, the plaintiff's decedent, Norman Allen, was caused to endure conscious pain and suffering.

100.    Based on all of the credible evidence presented at trial, the Court finds that the defendant's deviations from the accepted standards of medical care were a substantial contributing factor in causing the death of Norman Allen.

101.    Based on all of the credible evidence presented at trial, the Court finds that the defendant's deviations from the accepted standards of medical care were a substantial contributing factor in causing Norman Allen to experience conscious pain and suffering.

102.    Based on all of the credible evidence presented at trial, the Court finds that the defendant's deviations from the accepted standards of medical care were a substantial contributing factor in causing Ruth Allen to suffer a loss of her relationship with Norman Allen.

103.     Based on all of the credible evidence presented at trial, the Court finds that the defendant's deviations from the accepted standards of medical care were a substantial contributing factor in causing Tammy Allen to suffer a loss of her relationship with Norman Allen.

104.    Based on all of the credible evidence presented at trial, the Court finds that the defendant's deviations from the accepted standards of medical care were a substantial contributing factor in causing Stephen Allen to suffer a loss of his relationship with Norman Allen.

**RULINGS OF LAW**

1.      This court has jurisdiction over this matter pursuant to 28 U.S.C. sec. 1346(b), the Federal Tort Claims Act.

2.      Under 28 U.S.C. sec. 1346(b) the United States is the proper defendant in this matter.

3.      Tammy Allen is the legal representative of the estate of Norman Allen, and <u>is the proper party to bring this lawsuit</u>. <u>Santos v. Lumbermans Mutual Casualty Co.</u>, 408 Mass. 70, 76 (1990); <u>Gaudette v. Webb</u>, 362 Mass. 60, 71 (1972).

4.      Pursuant to the Federal Tort Claims Act, the trial court applies the substantive law of the state where the act or omission occurred.  28 U.S.C. sec. 1346(b); <u>Zabala Clemente v. United States</u>, 567 F.2d 1140, 1143 (1st Cir. 1977).  Therefore, Massachusetts law applies as Norman Allen was treated in Massachusetts.

5.      The defendant, The United States of America, <u>is a public employer within the meaning of 28 U.S.C. sec. 1346(b) and sec. 2671 et seq. and at all times herein</u> relevant operated and/or funded the Greater Lawrence Family Health Center in Lawrence, Massachusetts.

6.      <u>As a public employer within the meaning of 28 U.S.C. sec. 1346(b) and sec. 2671 et seq., The United States of America is liable and legally responsible</u> for the conduct of its physician employees, including Michael Kelly, M.D.

7.      In a civil action such as this, the burden of proof is on the plaintiff to prove every essential element of his claim by a fair preponderance of the credible evidence. To establish something by a preponderance of the evidence is simply to prove that something is more likely to be true than not true, 51% to 49%.  <u>Sargent v. Massachusetts Accident Co.</u>, 307 Mass. 246, 250 (1940).

8.      There was a doctor/patient relationship in 1998 and 1999 between Dr. Kelly and Norman Allen.  As a matter of law, Dr. Kelly owed Norman Allen the duty of rendering acceptable medical care in his treatment.  <u>Dinsky v. Framingham</u>, 386 Mass. 801, 804 (1982);  <u>Civitarese v. Gorney</u>, 358 Mass. 652 (1971);  <u>Berardi v. Menicks</u>, 340 Mass. 296 (1960).

9.      Dr. Kelly, by undertaking to treat and care for the plaintiff's decedent, represented that he possessed, and the law further placed upon him a duty to possess and use, such skill and care and learning as is ordinarily possessed by the average qualified physician.  <u>Brune v. Belinkoff</u>, 354 Mass. 102, 109 (1968).

10.     A doctor is not held to the standards of perfection or excellence, but he must be more than minimally competent.  He must know what the average physician

would know, and must practice his specialty in the manner of the average qualified physician.  Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

11.    A doctor is held to the standard of care and skill of the average member of the profession practicing that specialty, taking into account the advances on the profession and the resources available to him.  Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

12.    By undertaking to treat and care for Norman Allen, Dr. Kelly represented that he possessed, and the law further placed upon him a duty to possess and use, such skill and care and learning as is ordinarily possessed by the average qualified physician, taking into account the advances in the profession.  See Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

13.    Dr. Kelly is held to the standard of care and skill of the average member of the profession practicing as a primary care physician in 1998 and 1999.  Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

14.    Dr. Kelly failed to conform to the standards of practice of the average qualified physician in 1998 and 1999 and was negligent in his care and treatment of the plaintiff's decedent.

15.    Dr. Kelly had a legal duty to offer or perform colorectal cancer screening to Normal Allen in 1998 and 1999.

16.    Dr. Kelly breached his duty when he failed to offer or perform colorectal cancer screening to Normal Allen in 1998 and 1999.

17.    Where a witness gives adverse or damaging testimony as to his/her own knowledge, feelings or opinions, the law considers that no one can testify on these issues better than the party him/herself.  Therefore, a witness, who is also a party, is bound by this type of testimony, and is not entitled to the benefit of more favorable evidence on that issue coming from another source. Green v. Richmond, 369 Mass. 47 (1967); Moskon v. Smith, 318 Mass. 76 (1945);  Liacos, P.J., Handbook of Massachusetts Evidence, 6th ed., 1994, § 2.11, pp. 58-60.

18.    Any admissions made by the defendant, Dr. Kelly, either by deposition testimony, testimony from the witness stand, or evidence in the medical records, may be considered as evidence of negligence.  See Collins v. Baron, 392 Mass. 565, 568-569, n.2 (1984).

19.    If a factfinder determines that a defendant has made false or inconsistent statements regarding his treatment of the plaintiff, the factfinder may infer that those false or inconsistent statements were made out of a consciousness of liability.  McNamara v. Honeyman, 406 Mass. 43 (1989); Sheehan v. Goriansky, 317 Mass. 10 (1944).

20.    While a doctor must use his best judgment, that alone is insufficient to satisfy the physician's standard of care. <u>Riggs v. Christie</u>, 342 Mass. 406 (1961); Nolan, <u>Tort Law</u>, §179, M.P.S. 37 (1979).

21.    <u>The best judgment of the defendant, The United States of America, by and through Dr. Kelly, deviated from the accepted standards of medical care, and thus the defendant was legally negligent.</u>

22.    "There is implicit recognition in the law of the Commonwealth, as elsewhere, that a person has a strong interest in being free from non-consensual invasion of his bodily integrity...in short, the law recognizes the individual interest in preserving `the inviolability of his person.'" <u>Pratt v. Davis</u>, 118 Ill. App. 161, 166 (1905), <u>aff'd</u>, 224 Ill. 300 (1906).

23.    One means by which the law has developed in a manner consistent with the protection of this interest is through the development of the doctrine of informed consent." <u>Superintendent of Belchertown State School v. Saikewizc</u>, 373 Mass. 728, 738-739 (1977). <u>See</u> <u>also</u> <u>In the Matter of Spring</u>, 380 Mass. 629 (1980); <u>Cobbs v. Grant</u>, 8 Cal. 3rd. 229, 242, 104 Cal. Rptr. 505, (1972); <u>Schloendorff v. Society of the New York Hosp.</u>, 211 N.Y. 125, 129-130, (1914).

24.    The law of informed consent in Massachusetts has evolved beyond bodily invasion to include a course of treatment. <u>Feeley v. Baer</u>, 424 Mass. 875, 877, n.2 (1997); <u>Precourt v. Frederick</u>, 395 Mass. 689 (1985); <u>Harnish v. Children's Hospital Medical Center</u>, 367 Mass. 152, 154-155 (1982).

25.    "[I]t is the prerogative of the patient, not the physician, to determine...the direction in which...his interest lie." <u>Cobbs v. Grant</u>, <u>supra</u> at 242, 104 Cal. Rprs. at 505 (1972); <u>Canterbury v. Spence</u>, 464 F.2d 772, 781 (D.C.Cir), <u>cert.</u> <u>denied</u>, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

26.    Where there are alternative courses of treatment, the patient has the right to be informed by his physician of all material risks attendant to each course of treatment so that he can make her own decision. The law recognizes the right to choose among alternative courses of treatment that the doctors would not themselves have chosen. <u>Harnish v. Children's Hospital Medical Center</u>, 387 Mass. 152 (1982).

27.    Materiality is the significance that a reasonable person, in what the physician know or should know is his patient's position, will attach to the disclosed risk or risks in deciding whether to submit or not to submit to a course of treatment. Material information may include the nature of the patient's condition, the nature and probability of the risks involved, the benefits to be reasonably expected, the likely results of no treatment, and the available alternatives, including their risks and benefits. <u>Harrison v. United States</u>, 285 F.3d 293 (1st Cir. 2002).

11

28.   Whether a risk of injury is material to a patient depends on the severity of the potential injury as well as the probability of the injury occurring. Harrison v. United States, 285 F.3d 293 (1ˢᵗ Cir. 2002); Precourt v. Frederick, 395 Mass. 689 (1985); Harnish v. Children's Hospital Medical Center, 367 Mass. 152, 154-155 (1982).

29.   A physician's failure to divulge in a reasonable manner to a patient, sufficient information to enable him to make an informed judgment whether to give or withhold consent to a medical and/or surgical procedure or proposed course of treatment constitutes professional misconduct and medical malpractice.  Harrison v. United States, 285 F.3d 293 (1ˢᵗ Cir. 2002); Precourt v. Frederick, 395 Mass. 689 (1985);   Harnish v. Children's Hospital Medical Center, 367 Mass. 152, 154-155 (1982).

30.   Apart from the duty to exercise the same degree of diligence and skill of the average-qualified practitioner or specialist, as the case may be, in diagnosis and treatment, a physician has a separate duty to disclose the material risks involved in the course of treatment and the availability of alternate treatments.  The law imposes this duty because it recognizes the patient's right to receive information on which to base an intelligent, informed consent to a course of treatment. Harrison v. United States, 285 F.3d 293 (1ˢᵗ Cir. 2002); Precourt v. Frederick, 395 Mass. 689 (1985); Harnish v. Children's Hospital Medical Center, 367 Mass. 152, 154-155 (1982).

31.   In order for the plaintiff to recover on an informed consent claim, the plaintiff must show that the defendant failed to disclose material risks of the course of treatment and failed to disclose the availability of alternate treatment.  The plaintiff must first prove that Dr. Kelly had a duty to disclose the information.  Second, the plaintiff must prove that Dr. Kelly's failure to disclose the information was causally related to the conscious pain and suffering and death of Normal Allen.  See Haley v. Birbiglia, 390 Mass. 540, 548 (1983) (setting forth the requirements in Harnish, supra).

32.   In order to show that Dr. Kelly had a duty to disclose the information, the plaintiff must establish (a) that there existed a doctor-patient relationship; (b) that the information subject to disclosure was information which the doctor knew or should have known; (c) that the information must be of a kind that the doctor should reasonably have recognized was material to the patient's decision; and (d) that the doctor failed to disclose the information to the patient.  Haley v. Birbiglia, 390 Mass. 540, 548 (1983) (setting forth the requirements in Harnish, supra).

33.   Dr. Kelly had a legal duty to disclose to Norman Allen information concerning the risks and benefits of colorectal screening in the form of a rectal exam, fecal occult blood testing, sigmoidoscopy with barium enema or colonoscopy.

34. <u>Dr. Kelly failed to disclose to Norman Allen the risks and benefits of colorectal screening in the form of a rectal exam, fecal occult blood testing, sigmoidoscopy with barium enema or colonoscopy, as required by law</u>.

35. <u>Dr. Kelly's breach of his legal duty to provide informed consent to Norman Allen caused or contributed to his death.</u>

36. <u>Dr. Kelly committed medical malpractice when he failed to consider and disclose Norman Allen's risk for developing rectal cancer, the nature and probability of risks involved with not conducting colorectal screening, the benefits to be reasonably expected from the available alternative treatment, and the risks to be reasonably expected from the available alternative treatment. Harrison v. United States, 285 F.3d 293 (1st Cir. 2002); Harnish v. Children's Hospital Medical Center, 387 Mass. 152 (1982).</u>

37. Proximate cause is the legal term used to describe the relationship between an event and the harm that flows from the happening of that event. The proximate cause need not be the sole cause or even the predominant cause as long as it was not insignificant or negligible. <u>O'Connor v. Raymark Industries, Inc.</u>, 401 Mass. 586 (1988); <u>Wallace v. Ludwig</u>, 292 Mass. 251 (1935); *Restatement* (Second) *Torts*, ss. 433 et. seq.

38. <u>The plaintiff is not required to prove the exact cause of the injury to Norman Allen or to exclude all possibility that injuries occurred without fault on the part of Dr. Kelly. The plaintiff needs only prove that Norman Allen's conscious pain and suffering and/or his death was more likely due to the negligence of Dr. Kelly than to some other cause. Woronka v. Sewall, 320 Mass. 362 (1946); Carey v. General Motors Corp., 377 Mass. 736 (1979); O'Connor v. Raymark Industries, Inc., 401 Mass. 586, 592 (1988).</u>

39. <u>The plaintiff does not need to prove that Dr. Kelly could foresee or should have foreseen the precise injury to Norman Allen that occurred. The plaintiff need only show that the harm to Norman Allen was reasonably to be anticipated because of Dr. Kelly's failure to exercise the care and skill of the average qualified physician in his field of specialization. Marangian v. Apelian, 286 Mass. 329, 436-437 (1934).</u>

40. <u>The defendant, The United States of America, by and through Dr. Kelly, is liable to the Estate of Norman Allen if Dr. Kelly's negligence was a proximate cause of Norman Allen's death, as well as the conscious pain and suffering preceding his death. Harlow v. Chin, 405 Mass. 697, 702 (1989).</u>

41. <u>The defendant, The United States of America, by and through Dr. Kelly, is legally liable to the Estate of Norman Allen because Dr. Kelly's negligence was a proximate cause of Norman Allen's death, as well as the conscious pain and suffering preceding his death.</u>

Case 1:05-cv-11463-DPW    Document 23    Filed 02/20/2007    Page 14 of 16

42.  The defendant, The United States of America, by and through Dr. Kelly, is legally liable to the Estate of Norman Allen because Dr. Kelly failed to provide material information and to obtain informed consent prior to proceeding with his course of treatment (no colorectal screening), and Dr. Kelly's failure was a proximate cause of Norman Allen's death.

43.  In cases where damages are awarded, the law prescribes no definite measure of damages but leaves the matter to be fixed by the finder of fact, and as under all the circumstances and under the evidence may be just and proper.  It is not necessary, therefore, that any witness should have expressed an opinion as to the amount of such damage.  Damages should be based on all of the facts and circumstances revealed by the evidence, the consideration of them in connection with the court's own knowledge and experience in the affairs in life, in order to fairly compensate the plaintiff for all the losses that have been suffered.  Griffin v. General Motors Corp., 380 Mass. 362, 366 (1980).

44.  The purpose of such compensation is to award to the plaintiff the equivalent in money for actual past, present, and future losses.  Salimene v. B. Gravel & Co., K.G., 399 Mass. 790 (1987); Griffin v. General Motors Corp., 380 Mass. 362, 366 (1980).

45.  Norman Allen's estate is entitled to recover for any conscious pain and suffering experienced by Norman Allen as a result of Dr. Kelly's negligence and/or failure to obtain informed consent.  Mass. Gen. Laws c. 229, § 6.

46.  Norman Allen's wife, Ruth Allen, and his two children, Stephen Allen and Tammy Allen, are the persons entitled to recover in this case under the Massachusetts wrongful death statute.  Santos v. Lubermens Mutual Casualty Co., 408 Mass. 70, 77 (1990).

47.  Ruth Allen is entitled to recover an amount of money that represents the value of the net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice that Norman Allen would have afforded to her during his lifetime.  Mass. Gen. Laws c.229, § 2; Shutz v. Grogean, 406 Mass. 364, 366 (1990); Hewitt v. United States, 550 F. Supp. 589, 592 (D. Mass. 1982); Alden v. Norwood Arena, Inc., 332 Mass. 267, 277 (1955).

48.  Stephen Allen is entitled to recover an amount of money that represents the value of the net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice that Norman Allen would have afforded to his during his lifetime.  Mass. Gen. Laws c.229, § 2; Shutz v. Grogean, 406 Mass. 364, 366 (1990); Alden v. Norwood Arena, Inc., 332 Mass. 267, 277 (1955).

49.  Tammy Allen is entitled to recover an amount of money that represents the value of the net income, services, protection, care, assistance, society, companionship,

comfort, guidance, counsel and advice that Norman Allen would have afforded to her during his lifetime. Mass. Gen. Laws c.229, § 2; Shutz v. Grogean, 406 Mass. 364, 366 (1990); Alden v. Norwood Arena, Inc., 332 Mass. 267, 277 (1955).


## DAMAGES

1.  For Norman Allen's conscious pain and suffering, the amount of damages awarded is $_____ ____

2.  For Norman Allen's wrongful death, the amount of  damages awarded is as follows:

    Ruth Allen:            $_____ ____

    Stephen Allen:         $_____

    Tammy Allen:           $_____

Respectfully submitted,
The plaintiff,
By her attorney,


_____
WILLIAM J. THOMPSON
BBO # 559275
LUBIN & MEYER, P.C.
100 City Hall Plaza
Boston, MA 02108
(617) 720-44478 (tel)
(617) 720-1229 (fax)

15

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew C. Meyer, Jr., hereby state that on February 14, 2007, I served a copy of the following:

*Plaintiff's Proposed Findings of Fact and Rulings of Law*

on the defendant, via e-mail, facsimile, and by mailing a copy of the same, postage prepaid addressed to the following parties of interest:

Christopher Alberto, Assistant U.S. Attorney
U.S. Department of Justice
John Joseph Moakley United States Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210

William J. Thompson
Lubin & Meyer, P.C.
100 City Hall Plaza
Boston, MA 02108
(617) 720-4447
BBO #: 559275

16