UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TAMMY ALLEN, PERSONAL REPRESENTATIVE OF THE ESTATE OF NORMAN ALLEN <br>     Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA Defendant. | ) <br> ) <br> ) <br> ) <br> ) Case No. 05-11463 -DPW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### DEFENDANT'S PROPOSED ADDITIONAL OR SUBSTITUTE FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Defendant, the United States of America, by its attorneys, submits the following proposed findings of fact and conclusions of law:

1. This court has jurisdiction over matters that conform to the requirements of the Federal Tort Claims Act, , 28 U.S.C. §§ 1346(b) and 267 1-2679, a congressional waiver of sovereign immunity that is to be strictly construed.

2. Under 28 U.S.C. § 1346(b) the United States is the proper defendant in a matter that is properly brought under the Federal Tort Claims Act.

3. Michael Kelly, M.D., <u>was not an employee of the United States, but</u> is deemed to be an employee for purposes of this case under the Federally Supported Health Centers Assistance Act of 1992, 42 U.S.C. § 233(g) and the Federal Tort Claims Act.

4. <u>There is no concept of a public employer within the meaning of the Federal Tort Claims Act.</u>

5. <u>The law of informed consent is not relevant to this case.</u>

6. <u>The law on informed consent as it pertains to course of treatment is not relevant to the case.</u>

7. <u>"The duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it."</u> *Roukounakis v. Messer,* 63 Mass.App.Ct. 482 (2005), citing *Bays v. St. Luke's Hosp.,* 63 Wash.App. 876, 883 (1992).

8. In conducting a digital rectal exam a physician is trying to determine the size of the prostate gland and may also attempt to detect any growths that are within the sensing zone of the doctor's finger.

9. Norman Allen's rectal cancer was located <u>8 cm</u> into the rectum <u>which would be beyond the reach of a physician's finger sensing zone</u>.

10. [During the time period 1995 through 2001, the record keeping at the Greater Lawrence Family Health Center had delays in documents and consultation letters getting into the file.]

11. [Once the consultation letter was received by the Greater Lawrence Family Health Center there was some delay in that mail getting to the doctor's mailbox.]

12. <u>There is no evidence and no party knows when Dr. Simms' July 13, 1999 report was transcribed, sent, and received at the Greater Lawrence Family Health Center.</u>

13. <u>During the period of 1997 through 2001 it was the norm for it to take ten days to two weeks for consultation letters from the Boston Medical Center to be transcribed and sent.</u>

14. [Once the letter was received by the Greater Lawrence Family Health Center, there was some delay in it getting to the doctor's mailbox.]

15. <u>When Dr. Kelly gave Mr. Allen a lab slip for testing, that would not, under normal practice during 1995 - 2001, be noted or recorded in Mr. Allen's medical file at the Greater Lawrence Family Health Center.</u>

16. [During the relevant period of 1996 through 2001, physicians at the Greater Lawrence Family Health Center provided patients with lab slips for testing at the Lawrence Memorial Hospital which is located next door to the family health center.]

17. <u>If a patient does not follow through with that lab slip there would be no record in the Greater Lawrence Family Health Center file that a lab slip was provided to that patient and that the patient did not have that test completed.</u>

18. <u>Additionally, if the patient took the lab slip to Lawrence Memorial Hospital and received fecal occult blood slide and that patient did not bring back the slide to the laboratory there would be no record in the Greater Lawrence Family Health Center file.</u>

19. [During the relevant period of 1990 through 2001, Ruth Allen, Tammy Allen, Norman Allen, and Steven Allen, applied for and were determined eligible for Medicaid.]

20. [During the relevant period 1995 through 2001, neither Ruth Allen, Norman Allen, Tammy Allen, and Steven Allen had checking or savings accounts.]

21. [During the period 1999, 2000, 2001 Steven Allen did not earn an income, as that term is defined on his federal 1040 tax form.]

22. During the relevant period 1991 through 1999, <u>Norman Allen did not earn an income</u>, that he shared or distributed or contributed for the care and finances of

Tammy Allen and Steven Allen.

23. [During the relevant period 1999 through 2002, Steven Allen testified at deposition that he paid his father for work that his father performed at Allen Enterprises.]

24. At no time did Norman Allen inform Dr. Kelly or the Greater Lawrence Family Health Center that he had a family history that was positive for rectal cancer or that his father had rectal cancer in the past.

25. Norman Allen's medical history was elicited from him when he first appeared at Greater Lawrence Family Health Center in January 1996. The intake form bears a handwritten date of 1/5/95 because it is common at the beginning of a year to erroneously continue to write the previous year.

26. The records of the health center show that Norman Allen did not disclose any family history of cancer despite the clear policy of the health center to have the patient disclose any history of cancer.

27. It is a policy of the Greater Lawrence Family Health Center to take a complete family history of each patient that first appears at the clinic for care.

28. In Mr. Allen's case, the intake employee asked specifically if Mr. Allen had a history of cancer in his family.

29. Mr. Allen told the Greater Lawrence Family Health Center and Dr. Kelly that his family history included his father having had heart problems and his mother having had asthma.

30. Nowhere in the record from January 5, 1996 when that family history was taken

until his last visit to Dr. Kelly did Mr. Allen ever state that he had a family history of cancer.

31. Mr. Allen did report that he had an eighth grade education, that he was unemployed since 1990, that his activity was to watch TV, and that he used tobacco, alcohol and recreational, illegal drugs.

32. While cancer prognosis is statistically correlated with clinical stage at diagnosis, that association does not hold for every patient, and it cannot be stated that diagnosis at an earlier stage indicates a curable cancer that is subsequently cured.

33. Clinical staging is a rough process that uses important clinical factors to stratify patients by average prognosis, but the prognosis of patients within a single clinical stage may vary widely.

34. Patients in a lower stage may differ little from patients in a higher stage since they may be distinguished only by a small difference in the amount of tumor on which the stage difference is based.

35. If the more extensive cancer is detectable, the patient is assigned to the higher stage, if not, to the lower stage.

36. Clinical stage alone, even if determined accurately, does not determine prognosis. Other factors may have important prognostic implications. The rate of growth of a cancer is a very important indicator of prognosis. This information is not readily incorporated into clinical staging systems because it can only be determined over time, so it is not available in the short interval when initial treatment decisions are being made.

37. <u>A cancer which doubles within a month, a rapid rate for a colon cancer, would have first invaded the lymph node 25 to 34 months before it was detected in late 1999 to achieve a 1 cc size, which would establish its origin in 1996 or 1997.</u>

38. <u>Screening in 1998 or 1999, even if it diagnosed the cancer, would not have preceded the establishment of a lymph node metastasis.</u>

39. <u>Mr. Allen had a rapid metastatic progression indicating a very biologically aggressive cancer.</u>

40. <u>Aggressive cancers are less likely to be diagnosed by screening tests when curable.</u>

41. <u>The period when Dr. Kelly was notified of the history of rectal bleeding</u> and his referral to Dr. Fazio in late September 1999 did not materially affect the patient's outcome.

42. When Mr. Allen presented to Dr. Kelly on April 6, 1999, his complaint of pain <u>was related to arthritis.</u>

43. Although Dr. Simms saw Mr. Allen on July 13, 1999, <u>Dr. Simms' dictated report was not received by Dr. Kelly until after August 3, 1999</u>.

44. When Dr. Kelly had a visit from Mr. Allen on August 3, 1999 <u>there was no reference to Mr. Allen's episodes of bloody stool as reported by Dr. Simms because Dr. Kelly had not received Dr. Simms' report as of that time.</u>

45. <u>A regular part of Dr. Kelly's practice included giving guaiac cards to patients for colorectal screening.</u>

46. Mr. Allen's cancer was diagnosed a little over <u>8 cm</u> from the anal verge, <u>so the</u>

cancer would not have been diagnosed by a rectal exam.

47. Earlier stage cancers are not necessarily more curable although medical trials indicate that fewer patients die of colorectal cancer after one of the screening methods than when they do not undergo screening although the strength of the variable supporting data varies by screening method.

48. Not all cancers diagnosed by screening are curable.

49. The most aggressive and dangerous cancers grow so fast that screening does not detect them.

50. There is limited ability in medicine to detect more advanced cancer, especially in small amounts.

51. Any alleged failure to obtain colorectal cancer screening some time after February 1998 did not contribute to Mr. Allen's death from colon cancer, since it is likely he had microscopic metastatic colon cancer prior to that time.

52. It is clear that the metastasis must have established itself earlier than when the cancer was detected in lymph nodes in October 1999.

53. From the behavior of his cancer after diagnosis, Mr. Allen had an aggressive, rapidly-growing cancer that was unlikely to be detected at a curable stage by screening.

54. The care provided to Mr. Allen by Dr. Kelly conformed to the standards of practice of an average qualified primary care physician from 1995 - 2000.

55. Primary care physicians commonly did not recommend colorectal cancer screening during 1995 - 2000.

56. <u>The average physician from 1997 - 2000 did not regularly screen for colorectal cancers in patients with ailments similar to those of Mr. Allen.</u>

57. <u>Norman Allen did not inform the Greater Lawrence Family Health Center that his father allegedly suffered from colorectal cancer at the time of his first visit in January 1996.</u>

58. Even though he informed the health center of his father's myocardial infarctions and his mother's asthma, <u>Dr. Kelly was not given information by Mr. Allen about family history of colorectal cancer and therefore, Dr. Kelly had little reason to believe Mr. Allen would have been at high risk for colorectal cancer.</u>

59. When Mr. Allen consulted with Dr. Fazio and noted family history of rectal cancer <u>that was not previously reported by Mr. Allen to the Greater Lawrence Family Health Center.</u>

60. <u>Mr. Allen's colorectal cancer had spread much earlier and was already incurable before the April or August 1999 office visits.</u>

61. Mr. Allen did not consult Dr. Kelly <u>specifically for health maintenance.</u>

62. The majority of Mr. Allen's visits to Dr. Kelly were focused on his <u>urgent muscular, sleep and emotional issues leaving little opportunity for addressing other health improvement topics. Otherwise, Mr. Allen largely avoided blood tests and screening, but made numerous requests for pain relief drugs.</u>

63. <u>Colorectal cancer screening was not the accepted standard of care at the time in question and Dr. Kelly's actions complied with the standard of care for the averaged qualified primary care physician.</u>

64. <u>It is not the standard of practice for doctors to routinely document recommended colorectal cancer screening.</u>

65. [The Medicare program from 1998 - 2002 did not provide colorectal cancer screening tests for the majority of beneficiaries.]

66. [Medicare and Medicaid did not begin to routinely cover the costs of colorectal cancer screening until 2001.]

67. <u>Mr. Allen was not known to be in a high risk patient group.</u>

68. Before Mr. Allen's 50th birthday he did not have any colorectal symptoms to indicate evaluation for other purposes.

69. At the age of 50, screening for colorectal cancer is recommended, <u>but not accepted as the standard of care.</u>

70. [The majority of patients who were screened in 1997 through 1999 did not complete their examinations until they were 52 or older.]

71. [In the case of Mr. Allen, his diagnosis at age 52 would not have made a material change in his prognosis.]

72. <u>Colorectal cancer screening was not the accepted standard of care even after Mr. Allen turned 50</u>.

73. <u>Dr. Kelly's actions complied with the standard of care for the average qualified primary care physician.</u>

74. <u>The testimony of Ruth Allen is not credible.</u>

75. <u>The testimony of Tammy Allen is not credible.</u>

76. <u>The testimony of Steven Allen is not credible.</u>

77. The relationship between Norman Allen and Ruth Allen for a substantial period of time prior to Norman Allen's death was at least difficult if not abusive.

78. The relationship between Steven Allen and Norman Allen was at least difficult of not abusive.

79. The relationship between Tammy Allen and Norman Allen was at least difficult of not abusive.

80. Ruth Allen was alienated from Norman Allen during the period before his death.

81. [Norman Allen ingested a substantial quantity of illegal drugs during the five years prior to his death.]

82. [Steven Allen ingested a large quantity of illegal drugs including heroin, crack and cocaine prior to his father's death.]

83. [Steven Allen continues to consume and use those drugs.]

84. [Tammy Allen ingested a large quantity of illegal drugs prior to her father's death.]

85. [Tammy Allen continues to consume and use those drugs.]

86. [Ruth Allen has stolen property from others including the activity of shoplifting.]

87. [Steven Allen has stolen the property of others.]

88. [Ruth Allen, Tammy Allen, and Steven Allen have expended a tremendous amount of their funds on their purchase of illegal drugs.]

89. [The illegal drug use of Ruth Allen, Tammy Allen, and Steven Allen and their inability to remain employed for an extended period of time because of that drug use has placed them under severe financial stress.]

90. Norman Allen's drug use inhibited his ability to be able to communicate with his

doctor.

91. [Rather than Norman Allen's death and loss of consortium, it was drugs and abuse that effectively destroyed and alienated the Allen family life.]

92. [Norman Allen consumed large quantities of drugs as well as alcohol, caffeine as well a smoking two packs of cigarettes per day.]

93. [That lifestyle not only affected his ability to communicate with his doctor but also had a detrimental effect on his health.]

94. [Allen Enterprises went out of business not because of Norman Allen's death but because if Steven Allen's addiction to drugs which effected his ability to manage the business properly.]

95. [A substantial amount of the funds and profits earned in the business were used to purchase drugs.]

96. [Ruth and Steven Allen have been arrested for the possession of illegal drugs.]

97. [Steven Allen has an extensive criminal history.]

98. [Steven Allen was terminated from his position at United Van Lines because he lied about his criminal history on employment application.]

99. [Norman Allen went to Greater Lawrence Community Family Health Center to seek pain killers and also to get support for this applications for disability payments.]

100. Norman Allen did not seek proactive medical care or take responsibility for his health including requesting general physical exams from Dr. Kelly.

101. Mr. Allen's extensive use of illegal drugs hampered his ability to communicate,

<u>remember, masked physical symptoms, provided an incentive for him to avoid blood tests, provided him an incentive to appear at the Greater Lawrence Community Health Center for prescription narcotics and caused a variety of other symptoms including urgent sleep and emotional issues, thereby leaving little opportunity for Dr. Kelly to address other systemic health care issues.</u>

102. <u>[The current use of illegal drugs by Ruth, Steven, and Tammy Allen coupled with other testimonial evidence at trial will demonstrate that Mr. Allen lived and pursued a lifestyle that included an extensive use of illegal drugs during the 1996 through 1999 time period.]</u>

103. <u>[The evidence regarding the Allen family's extensive past and present drug abuse also demonstrates Ruth, Tammy and Steven Allen's testimony that they never witnessed Mr. Allen using illegal drugs incredible.]</u>

104. <u>Plaintiff's damages contentions are contradicted by evidence about the employment and income status of Norman Allen, Ruth Allen, Steven Allen and Tammy Allen.</u>

105. <u>Contrary to the plaintiff's interpretation of</u> *Green v. Richmond,* <u>369 Mass. 47 (1967), that case stands for the proposition that "a party's admission in testimony at the trial are binding on the party in the absence of other evidence more favorable to the party." 369 Mass. 47, 51 (1967).</u> <u>This case does not deprive a witness of more favorable evidence from another source even when an admission is made.</u> *<u>Moskon v. Smith,</u>* <u>318 Mass. 76 (1945), similarly does not deprive a witness of the benefit of more favorable evidence on that issue from another</u>

<blockquote>
source. 318 Mass. at 77 (" Since there was no evidence more favorable to the defendant than his own testimony, he is bound by it."). Additionally, these cases, upon which the plaintiff relies in its 17th finding of fact, do not discuss admissions made in testimonies not given on the witness stand.
</blockquote>

106. "Testimony concerning conclusory admissions by a malpractice defendant may suffice to sustain a jury's finding of negligence if, from the admission, the jury "could infer an acknowledgment of all the necessary elements of legal liability." *Collins v. Baron,* 392 Mass. 565 (1 984)(where defendant allegedly said, "I severed your ureter. It's all my fault."), quoting *Zimmerman v. Litvich,* 297 Mass. 91, 94 (1937)(where defendant allegedly said, "I should have operated on him. That is the chance I took."). These cases only apply to conclusory admissions and such conclusory admissions, when made, are not irrefutable or decisive to the question of negligence.

107. A doctor is not held to the standards of perfection or excellence, but he must be more than minimally competent. He must know what the average physician would know, and must practice his specialty in the manner of the average qualified physician. *Brune v. Belinkof,* 354 Mass. 102, 109 (1968). A doctor is held to the standard of care and skill of the average member of the profession practicing that specialty, taking into account the advances of the profession and the resources

|  |  |
|---|---|
| available to him. *Id.* | Respectfully submitted, |
|  | MICHAEL J. SULLIVAN<br>United States Attorney |
| Dated: February 20, 2007 | By: /s/ Christopher Alberto<br>CHRISTOPHER ALBERTO<br>Assistant U.S. Attorney<br> 1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3100 |
|  | Of Counsel: /s/ George Eng<br>George Eng<br>U.S. Dept. of Health and Human Services |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20thday of February 2007, the Defendant's Trial Memorandum, Defendant's Proposed Additional or Substitute Findings of Fact and Conclusions of Law, Defendant's Mark-Up of Plaintiff's Proposed Findings, Expert Affidavits. foregoing was served upon William J. Thompson, Esquire, Lubin & Meyer, P.C., 100 City Hall Plaza, Boston, MA 02108, by certified mail, return receipt requested.

/s./ Christopher Alberto
CHRISTOPHER ALBERTO
Assistant U.S. Attorney